1   ELIZABETH B. MURRILL*
      *Solicitor General*
2   JOSEPH S. ST. JOHN*
      *Deputy Solicitor General*
3   SHAE G. MCPHEE*
      *Assistant Solicitor General*
4   LOUISIANA DEPARTMENT OF JUSTICE
    1885 N. Third Street
5   Baton Rouge, LA 70804
    Tel: (225) 326-6766
6   emurrill@ag.louisiana.gov
    stjohnj@ag.louisiana.gov
7
    JEFFREY M. HARRIS*
8   BRYAN K. WEIR (CA Bar #310964)
    JORDAN M. CALL*
9   CONSOVOY MCCARTHY PLLC
    1600 Wilson Boulevard, Suite 700
10  Arlington, VA 22009
    Tel: (703) 243-9423
11  jeff@consovoymccarthy.com
    bryan@consovoymccarthy.com
12  jordan@consovoymccarthy.com

13  *Counsel for Louisiana Wildlife and Fisheries Commission*

14  *Application for admission
    pro hac vice forthcoming*
15
    SEE SIGNATURE PAGE FOR
16  ADDITIONAL COUNSEL

17                    UNITED STATES DISTRICT COURT

18                    EASTERN DISTRICT OF CALIFORNIA

19

20

21   DELACROIX CORP., LOUISIANA          No.
     LANDOWNERS ASSOCIATION, INC.,
22   and LOUISIANA WILDLIFE AND
     FISHERIES COMMISSION,

23                   Plaintiffs,          **PLAINTIFFS' MEMORANDUM OF LAW
                                          IN SUPPORT OF MOTION FOR
24          v.                            TEMPORARY RESTRAINING ORDER
                                          AND PRELIMINARY INJUNCTION**
25   XAVIER BECERRA, in his official capacity
26   as Attorney General of California,

27                   Defendant.

28

1

## <u>TABLE OF CONTENTS</u>

2   TABLE OF AUTHORITIES ........................................................................................ ii

3   INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

4   BACKGROUND ......................................................................................................... 3

5       A.   The recovery of American alligator populations through comprehensive federal-

6           state-private conservation and management programs. .................................... 3

7       B.   This Court permanently enjoins California from outlawing American alligator sales
in 1979.............................................................................................................. 5

8
    C.   California again attempts to outlaw sales of American alligator products
9           notwithstanding the *Fouke* Injunction................................................................ 7

10      D.   This litigation .................................................................................................... 8

11  LEGAL STANDARD................................................................................................... 9

12  ARGUMENT .............................................................................................................. 10

13  I.   Plaintiffs are Likely to Succeed on the Merits. ....................................................... 10

14      A.   California Penal Code §653o(b)(1) is expressly preempted by the ESA...................... 10

15      B.   The Challenged Laws are preempted because they pose an obstacle to the

16          achievement of the purposes and objectives of federal law. ........................... 13

17      C.   The Challenged Laws violate the Commerce Clause by closing California's
channels of commerce to lawful interstate and foreign commerce............................. 16

18
    D.   California Penal Code §653o(b)(1) violates the Dormant Commerce Clause
19          because it engages in extraterritorial regulation............................................... 17

20  II.   The Remaining Preliminary Injunction Factors Tip Strongly in Favor of Plaintiffs. ..... 18

21      A.   Plaintiffs will suffer irreparable harm in the absence of preliminary relief.................. 18

22      B.   The balance of equities strongly favors Plaintiffs......................................... 21

23      C.   A TRO or preliminary injunction would be in the public interest ................................ 22

24  CONCLUSION............................................................................................................ 22

25  CERTIFICATE OF SERVICE .................................................................................... 24

26

27

28

Memorandum in Support of
Motion for Preliminary Injunction    i

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

*Alliance for the Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011)..................................................................... 18

4

*Am. Trucking Associations, Inc. v. City of Los Angeles,*
   559 F.3d 1046 (9th Cir. 2009)..................................................................... 22

5

*Amoco Prod. Co. v. Vill. of Gambell,*
   480 U.S. 531 (1987)..................................................................................... 18

6

*Arizona v. United States,*
   567 U.S. 387 (2012)..................................................................................... 10

7

8

*Armstrong v. Exceptional Child Ctr., Inc.,*
   135 S. Ct. 1378 (2015) ................................................................................. 9

9

*California Hosp. Ass'n v. Maxwell-Jolly,*
   563 F.3d 847 (9th Cir. 2009)....................................................................... 19

10

*Cavel Int'l, Inc. v. Madigan,*
   500 F.3d 544 (7th Cir. 2007)....................................................................... 21

11

12

*Crandall v. State of Nevada,*
   73 U.S. 35 (1867)......................................................................................... 16

13

*Dep't of Revenue of Ky. v. Davis,*
   553 U.S. 328 (2008)..................................................................................... 16

14

15

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.,*
   405 U.S. 707 (1972)..................................................................................... 16

16

*Fouke Co. v. Brown,*
   463 F. Supp. 1142 (E.D. Cal. 1979).....................................................*passim*

17

18

*Geier v. Am. Honda Motor Co.,*
   529 U.S. 861 (2000) .................................................................................... 15

19

*H.J. Justin v. Deukmejian,*
   702 F.2d 758 (9th Cir. 1983)....................................................................... 12

20

*Healy v. Beer Inst., Inc.,*
   491 U.S. 324 (1989)..................................................................................... 17

21

22

*Hines v. Davidowitz,*
   312 U.S. 52 (1941)....................................................................................... 12

23

*Kassel v. Consol. Freightways Corp. of Delaware,*
   450 U.S. 662 (1981)..................................................................................... 16

24

25

*League of Wilderness Defenders v. Connaughton,*
   752 F.3d 755 (9th Cir. 2014)....................................................................... 23

26

*Man Hing Ivory & Imports Inc. v. Deukmejian,*
   702 F.2d 760 (9th Cir. 1983)....................................................................... 12

27

28

*Nat. Audubon Soc'y v. Davis,*
  307 F.3d 835 (9th Cir. 2002) ............................................................................. 20

*Nat'l Audubon Soc'y, Inc. v. Davis,*
  307 F.3d 835 (9th Cir. 2002) ............................................................................. 13

*People v. K. Sakai Co.,*
  56 Cal. App. 3d 531 (1976) ............................................................................. 6, 18

*Rhorabough v. California Dep't of Corr.,*
  2006 WL 2401928 (E.D. Cal. Aug. 18, 2006) ..................................................... 9

*Short v. Brown,*
  893 F.3d 671 (9th Cir. 2018) ................................................................................ 9

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
  240 F.3d 832 (9th Cir. 2001) ................................................................................ 9

*Valle del Sol, Inc. v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013) ............................................................................ 23

*Western Watersheds Project v. Bernhardt,*
  391 F. Supp. 3d 1002 (D. Or. 2019) ............................................................. 18, 23


**CONSTITUTIONAL PROVISIONS, STATUTES, AND OTHER AUTHORITIES**

U.S. Const. art. I, §8, cl. 3 ...................................................................................... 16

16 U.S.C. §§3371-3378 ......................................................................................... 3, 6

16 U.S.C. §1531 ...................................................................................................... 13

16 U.S.C. §1535(f) ...................................................................................... 7, 10, 11

16 U.S.C. §1538 ................................................................................................ 11, 15

California Penal Code §653o ............................................................................ *passim*

California Penal Code §653r ............................................................................ *passim*

Cal. Stats. 1970, ch. 1557 .......................................................................................... 6

Cal. Stats. 1971, ch. 1283 .......................................................................................... 6

Cal. Stats. 1972, ch. 119 ............................................................................................ 6

Cal. Stats. 2006, ch. 660 ............................................................................................ 7

Cal. Stats. 2009, ch. 15 .............................................................................................. 7

Cal. Stats. 2014, ch. 464 ............................................................................................ 7

50 C.F.R. §23.70 ...................................................................................................... 15

50 C.F.R. §14.12 ...................................................................................................... 17

50 C.F.R. §17.42 ...................................................................................................... 15

50 C.F.R. §17.42(a) .................................................................................................... 5

50 C.F.R. §17.42(a)(2)(ii) ........................................................................................ 11

1

50 C.F.R. §17.42(a)(3) ............................................................................................ 11

2

Changes to the Special Rule Concerning the American Alligator,
    44 Fed. Reg. 59080 (1979) ................................................................................ 4

3

Endangered Species Convention; Amendments to the Appendices,
    44 Fed. Reg. 25480 (1979) ................................................................................ 4

4

5

Endangered Species,
    32 Fed. Reg. 4001 (1967) .................................................................................. 3

6

Reclassification of American Alligator to Threatened Status in Certain Parts of Its Range,
    42 Fed. Reg. 2071 (1977) .................................................................................. 4

7

Reclassification of the American Alligator,
    40 Fed. Reg. 44412, 44412 (1975) .................................................................... 3

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION AND SUMMARY OF ARGUMENT

The conservation and restoration of American alligator populations has been one of the great success stories of the environmental movement. American alligators were nearly extinct in the 1960s, yet are thriving today due to a comprehensive management and conservation program in which federal officials, state officials, and private parties work cooperatively to protect alligators and their habitat. Carefully regulated sales of alligator products (such as hides, eggs, and meat) are an integral component of those efforts, as revenue from the sales of such products gives landowners a powerful economic incentive to sustainably manage their alligator populations and make critical investments in protecting the alligators' wetlands habitat.

There are no American alligators naturally present in California. Yet California now seeks to impose its own regulatory regime that would severely disrupt the well-functioning conservation and management programs that have brought the alligator back from the brink of extinction. In laws due to take effect on January 1, 2020, California seeks to ban (subject to criminal penalties) the sale, possession with intent to sell, and importation of any products derived from the body of an American alligator. *See* California Penal Code Sections 653o and 653r (the "Challenged Laws"). The Challenged Laws are unconstitutional and unenforceable. Indeed, this Court has *already* permanently enjoined an identical predecessor statute on the ground that it was preempted by the federal Endangered Species Act ("ESA"). *See Fouke Co. v. Brown*, 463 F. Supp. 1142 (E.D. Cal. 1979). The *Fouke* injunction remains in force and has not been modified or dissolved. Thus, to resolve this motion (and this case), the Court need only declare that the *Fouke* injunction continues to bind the Attorney General and prohibits California from seeking to ban lawful sales of alligator products.

In all events, regardless of the current status of the *Fouke* injunction, Plaintiffs readily satisfy the criteria for issuance of a temporary restraining order or preliminary injunction. Plaintiffs are likely to succeed on the merits of their preemption and Commerce Clause claims. The Challenged Laws are expressly preempted by the ESA given that they prohibit conduct that is authorized and permitted by federal law. California's laws are also invalid on grounds of conflict

1    or obstacle preemption. Far from protecting American alligators, the Challenged Laws—if allowed

2    to go into force—would disrupt and upend a well-functioning federal-state regulatory program that

3    depends on sales of alligator products to support conservation and management efforts.

4        Plaintiffs will face severe and irreparable harm if the Challenged Laws are allowed to go

5    into effect. Plaintiff Louisiana Wildlife and Fisheries Commission controls and supervises wildlife

6    and wildlife management areas in Louisiana, including American alligators and their habitat.

7    Plaintiff Delacroix Corporation owns over 100,000 acres of American alligator habitat and derives

8    substantial revenue from the sale of American alligator eggs on its property. And the members of

9    Plaintiff Louisiana Landowners Association use their land for activities relating to alligator egg

10   collection and harvesting. If California's ban goes into force, it will significantly diminish the

11   demand for (and prices of) alligator products, resulting in severe and irreparable harm to Plaintiffs'

12   businesses. That loss of revenue, in turn, will reduce the amount of investment Plaintiffs are able

13   to make in erosion control, marsh restoration, shoreline stabilization, and other environmental

14   programs designed to protect alligators and their habitat. In short, California's misguided attempt

15   to "protect" alligators will have the exact opposite effect, by depriving Plaintiffs of the resources

16   needed to fund critical conservation and management efforts, to the detriment of alligator

17   populations and the environment more generally.

18       The balance of equities and the public interest tip overwhelmingly in Plaintiffs' favor.

19   Allowing the Challenged Laws to go into effect will severely disrupt businesses, conservation

20   efforts, and management programs for American alligators and alligator habitat. California's

21   interests, by contrast, are *de minimis*. Given that no alligators naturally reside in California, the

22   Challenged Laws are little more than an attempt to regulate conduct that occurs solely in other

23   states. Moreover, California itself postponed the effective date of the Challenged Laws by nearly

24   15 years, which is fatal to any suggestion that there is an imminent public need to enforce the ban

25   on alligator products. And, even assuming that California has some legitimate interest in protecting

26   animals that do not live in the state, American alligators are already exhaustively protected and

27   regulated by other federal and state laws that have succeeded in bringing the alligator back from

28

the brink of extinction. California will incur no meaningful harm to its interests if enforcement of the Challenged Laws is enjoined pending a final resolution of Plaintiffs' claims on the merits.

## **BACKGROUND**

### A. **The recovery of American alligator populations through comprehensive federal-state-private conservation and management programs.**

The American alligator is a reptile native to the states of Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, and Texas—but not California. *See* Baker Decl. ¶11. It has been harvested commercially since the 1800s. That harvesting was largely unregulated, leading to a decline in population until 1962, when Louisiana banned alligator hunting statewide. *See* Baker Decl. ¶12. In 1967, the federal government extended protection to the American alligator by classifying it as threatened with extinction for the purposes of the Endangered Species Preservation Act. Endangered Species, 32 Fed. Reg. 4001 (1967). And in 1969, Congress amended the Lacey Act (16 U.S.C. §§3371-3378)—which prohibits the taking, possession, or sale of certain wildlife in violation of state law—to encompass reptiles, any part, egg, or offspring thereof, or the dead body or parts thereof. When Congress enacted the Endangered Species Act in 1973, the listing of the American alligator was carried forward as "endangered" throughout its entire range. *See* Reclassification of the American Alligator, 40 Fed. Reg. 44412, 44412 (1975).

By 1974, recovery of the American alligator was well underway. The Governor of Louisiana asked the Secretary of the Interior to remove the population of American alligators in Cameron, Vermillion, and Calcasieu parishes from the list of threatened and endangered species. The U.S. Fish & Wildlife Service ("USFWS") agreed, and accordingly downgraded alligators in those parishes and captive alligators from "endangered" to "treated as threatened due to their similarity of appearance." *Id.* at 44412-13, 44422. At the same time, the federal government adopted strict controls on the taking, inventory, accountability, and disposition of alligators and products made from their hides. *Id.* at 44427-29.

In 1977, additional populations of the American alligator were reclassified from endangered to threatened in all of Florida and in coastal areas of Georgia, Louisiana, South Carolina, and Texas;

the USFWS also clarified that regulated harvesting was permitted in Cameron, Vermillion, and Calcasieu parishes. Reclassification of American Alligator to Threatened Status in Certain Parts of Its Range, 42 Fed. Reg. 2071, 2071, 2076 (1977). The USFWS rejected complaints that additional harvesting would "perpetuate and legalize the vogue for alligator hide products which conservationists are convinced need to be eliminated if most species of crocodilian are to survive," and pointed to "the elaborate system of tagging and registering all hides, already successfully implemented in Louisiana," as sufficient to keep poaching to low levels. *Id.* at 2075. The USFWS concluded that "[f]or crocodilians as a whole, the Service feels that the best long-run hope for their conservation lies in development of strong conservation programs," and "[s]uch programs must include vigorous enforcement of protective laws, strong control of international trade, and ***economic … incentives for the nations and peoples involved to institute such controls***." *Id.* (emphasis added).

By 1979, the excessive harvest of the American alligator which occurred in past years had given way to sound management of the species, such that the USFWS adopted rules permitting export of American alligator hides. Changes to the Special Rule Concerning the American Alligator, 44 Fed. Reg. 59080 (1979). That same year, the United States proposed to transfer the American alligator from Appendix I to Appendix II under Article 2(a) and Article 2(b) of the CITES Treaty, which regulates international commerce in endangered plants and animals. That transfer was agreed to at the Second Meeting of the CITES Conference of the Parties and became effective June 28, 1979. Endangered Species Convention; Amendments to the Appendices, 44 Fed. Reg. 25480, 25483 (1979). The American alligator is now listed only as "threatened due to similarity of appearance" to other species throughout its range. *See* 50 C.F.R. §17.11.

The harvest of American alligators in Louisiana (and in the other range states) is highly regulated and closely monitored by both state and federal officials. *See* Baker Decl. ¶¶14-16. Alligator populations are assessed annually through aerial nest surveys. *Id.* Based on annual population estimates, harvest quotas are determined by region and by habitat type. *Id.* Harvest quotas are then regulated through a mandatory permit and tagging system. *Id.* Prior to shipment, each alligator hide must be inspected by a Louisiana Department of Wildlife and Fisheries

("LDWF") agent who verifies that the hide is tagged. *Id.* Without the state shipping permit and the appropriate federal CITES tag, alligator hides cannot enter commerce. *See* 50 C.F.R. §17.42(a). If shipped abroad, the tags are again inspected by U.S. Port Inspectors at the port of export and then by CITES officials at the port of entry in the country that they are shipped to.

Every year, Louisiana is required to analyze and certify to the USFWS that its harvest and export of American alligators are not detrimental to the survival of the species and that all alligators entering trade have been legally acquired. *See* Baker Decl. ¶39. Louisiana most recently made that certification on November 8, 2019. *Id.*

As a result of its sustainable management program, Louisiana is able to generate a significant, sustainable harvest of American alligators that results in substantial income to Louisiana and its citizens. Sales of alligator products such as hides, eggs, and meat are an indispensable component of federal and state conservation and management efforts. *See* Baker Decl. ¶¶19-27, 33-36. In particular, the "economic value of American alligators acts as a powerful incentive for private landowners to actively manage and protect marshland to ensure a robust and health population of alligators." *Id.* ¶19. The revenue from sales of alligator products allows landowners to make critical investments in water control, shoreline protection, wetland restoration, and numerous other management techniques. *Id.* ¶21. Those investments result in benefits not only for alligators but also for other endangered and threatened species, and for the environment more generally. *Id.* ¶¶24-27; *see also* Benge Decl. ¶¶8-11, 16-20. In sum, the sustainable use management strategy for American alligators has been highly successful and, indeed, has been considered a model example of the recovery and sustainable use of a wildlife species.

**B. This Court permanently enjoins California from outlawing American alligator sales in 1979.**

In 1970, California enacted Penal Code Section 653o, effective December 1, 1970, which provided:

> It is unlawful to import into this state for commercial purposes, to possess with intent to sell, or to sell within the state, the dead body, or any part or product thereof, of any alligator, crocodile, polar bear, leopard, ocelot, tiger, cheetah,

jaguar, red wolf, timber wolf, vicuna, sea otter, free roaming feral horse, or
Spanish lynx.

Cal. Stats. 1970, ch. 1557, §1. In 1971, California made violation of Section 653o a criminal

offense:

> Notwithstanding the provisions of Section 3 of Chapter 1557 of the Statutes of
> 1970, it shall be unlawful to possess with intent to sell, or to sell, within this state,
> after June 1, 1972, the dead body, or any part or product thereof, of any fish, bird,
> amphibian, reptile, or mammal specified in Section 653o or 653p.
>
> Violation of this section constitutes a misdemeanor.

Cal. Stats. 1971, ch. 1283, §§1, 2 (codified at Cal. Penal Code Section 653r). A criminal penalty

was added to Section 653o itself the following year:

> Any person who violates any provision of this section is guilty of a misdemeanor
> and shall be subject to a fine of not less than one thousand dollars ($1,000) and not
> to exceed five thousand dollars ($5,000) or imprisonment in the county jail for not
> to exceed six months, or both such fine and imprisonment, for each violation.

Cal. Stats. 1972, ch. 119, §2. Violation of Section 653o is also a criminal violation of the federal

Lacey Act, 16 U.S.C. §§3371-3378.

The express purpose of Sections 653o and 653r is to disrupt the market for alligator products

and, in turn, decrease the number of alligators being harvested. As the California Court of Appeal

held, Sections 653o and 653r reflect a determination by the California legislature "that elimination

of a market for products derived from [the listed] species will promote their continued existence,"

and that the ban on the sale of products derived from those species "at least decreases the market

therefore." *People v. K. Sakai Co.*, 56 Cal. App. 3d 531, 537 (1976).

Founded by New Orleans native Phillip Fouke, the Fouke Company ("Fouke") was a

purchaser of American alligator hides in Louisiana and Florida. In the late-1970s, Fouke desired to

sell processed alligator hides in California, including to Gary's Leather Creations, Inc. ("Gary's").

Fouke and Gary's therefore filed suit in this Court against then-Governor Edmund G. Brown and

then-Attorney General Evelle J. Younger for declaratory and injunctive relief barring the

enforcement of Sections 653o and 653r with respect to American alligators.

1    Governor Brown and Attorney General Younger conceded that Sections 653o and 653r

2    conflict with the Endangered Species Act and its implementing regulations. The only dispute was

3    over the scope of the appropriate declaration and injunction. This Court accordingly granted

4    summary judgment in favor of Fouke and Gary's, adopted the declaratory and injunctive language

5    proposed by Governor Brown and Attorney General Younger, and held that California Penal Code

6    Sections 653o and 653r are expressly preempted by the Endangered Species Act of 1973,

7    particularly Section 6(f), 16 U.S.C. §1535(f). *Fouke Co. v. Brown*, 463 F. Supp. 1142 (E.D. Cal.

8    1979) ("*Fouke* Injunction"); *see also* St. John Decl. Exh. 1 (*Fouke* docket sheet) & Exh. 2 (*Fouke*

9    final summary judgment). The *Fouke* Injunction was not appealed and has not been modified or

10   vacated.

11   ### C.  California again attempts to outlaw sales of American alligator products
12        notwithstanding the *Fouke* Injunction.

13       In 2006, California lawmakers recognized that all states except California that had

14   previously attempted to prohibit the sale of manufactured alligator products had repealed those

15   provisions. Although the *Fouke* Injunction declared Section 653o to be "unconstitutional and

16   unenforceable" with respect to American alligators, the uncorrected statutory code was causing

17   confusion and uncertainty among manufacturers. Accordingly, with the encouragement of

18   Louisiana Governor Kathleen Blanco, California lawmakers sought to bring the statute into

19   conformity with the *Fouke* Injunction by removing the American alligator from the text of Section

20   653o. The resulting bill included a sunset provision, however, such that the importation and sale of

21   American alligators would again be banned effective January 1, 2010. Cal. Stats. 2006, ch. 660

22   (S.B. 1485).

23       In 2009, the sunset provision was extended to January 1, 2015, and renumbered as a separate

24   provision. Cal. Stats. 2009, ch. 15 (Cal. S.B. 609). The sunset provision was again extended in

25   2014, this time to January 1, 2020. Cal. Stats. 2014, ch. 464 (Cal. A.B. 2075). The sponsor of the

26   2014 bill, Luis Alejo, explained that letting the ban kick in would have a "chilling effect" on the

27   economic activity associated with alligators. *See* St. John Decl. Exh. 3.

28

In 2019, California lawmakers introduced three bills to again extend the sunset provision. Blanca Rubio, the sponsor of one of those bills, explained that "[w]ithout the legal, commercial market for alligator and crocodile products and the revenue it provides for farmers … the 'ecosystem' created to save alligators will collapse, with the unintended consequence of providing a market for illegal hunting and poaching." St. John Decl. Exh. 4. Animal rights activists nevertheless targeted those bills, largely based on their general opposition to the use of animal products, as well as a rehash of the illegal trade arguments that USFWS rejected in 1979. None of the extension bills passed. Thus, notwithstanding the *Fouke* Injunction, effective January 1, 2020, Section 653o will again ban the importation for commercial purposes, possession with intent to sell, or sale within California of American alligator products:

> Commencing January 1, 2020, it shall be unlawful to import into this state for commercial purposes, to possess with intent to sell, or to sell within the state, the dead body, or a part or product thereof, of a crocodile or alligator.

California Penal Code §653o(b)(1).

Activist groups such as PETA have cheered that "California's long-awaited ban will [now] go into effect" and manufacturers "can't hawk their skins in California anymore." St. John Decl. Exh. 5. More ominously, national law firms issued alerts that the sale of alligator products will be "illegal" in California after January 1st. St. John Decl. Exh. 6.

### D. This Litigation

Plaintiffs brought this suit to prevent the severe and irreparable injuries they will incur if the Challenged Laws are allowed to go into force. Plaintiff Louisiana Wildlife and Fisheries Commission equips, maintains and controls wildlife management areas, which include large areas of alligator habitat, in Louisiana. LWFC also controls and supervises wildlife in Louisiana, including American alligators. By disrupting the market for alligator products and the resulting revenue streams, the Challenged Laws would severely disrupt LWFC's conservation and management programs and its efforts to protect American alligators and their habitat. *See* Baker Decl ¶¶28-36.

Plaintiff Delacroix Corporation owns 100,000 acres of land in Louisiana, much of which is wetland alligator habitat. *See* Benge Decl. ¶1. Delacroix derives substantial revenue from its sales of American alligator eggs and its harvest of alligators. *Id.* ¶¶6-11. Similarly, the members of Plaintiff Louisiana Landowners Association own approximately 2 million acres of land, and derive substantial revenue from egg collection and the harvest of wild alligators. Sparks Decl. ¶¶4-10. To protect their valuable alligator habitat, Delacroix and LLA make significant investments in erosion control, marsh restoration, shoreline stabilization, and other environmental programs, all of which would be jeopardized if Plaintiffs faced a sudden loss of revenue from the sales of alligator products. *See* Benge Decl. ¶¶11-21; Sparks Decl. ¶7-15.

## LEGAL STANDARD

In deciding whether to grant a motion for a temporary restraining order, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *see also Rhorabough v. California Dep't of Corr.*, 2006 WL 2401928, at *1 (E.D. Cal. Aug. 18, 2006) ("Requests for temporary restraining orders are governed by the same general standards that govern the issuance of a preliminary injunction.").

To obtain a preliminary injunction, plaintiffs ordinarily need to show that: "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018). "The Ninth Circuit weighs these factors on a sliding scale," however. *Id.* So when there are "'serious questions going to the merits'— that is, less than a 'likelihood of success' on the merits—a preliminary injunction may still issue so long as 'the balance of hardships tips *sharply* in the plaintiff's favor' and the other two factors are satisfied." *Id.*

## ARGUMENT

**I.  Plaintiffs are Likely to Succeed on the Merits.**

### A.  California Penal Code §653o(b)(1) is expressly preempted by the ESA.

Under the Supremacy Clause, state laws that contravene validly enacted federal laws are preempted and have no force or effect. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015) ("[Courts] must not give effect to state laws that conflict with federal laws."). One way that preemption may occur is by the express direction of Congress. *See Arizona v. United States*, 567 U.S. 387, 399 (2012) ("There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision.").

Section 6(f) of the Endangered Species Act includes an express preemption provision, which provides:

> Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively … prohibit what is authorized pursuant to an exemption or permit provided for in this chapter or in any regulation which implements this chapter.

16 U.S.C. §1535(f). This provision unquestionably preempts California's alligator products ban.

In *Fouke*, 463 F. Supp. 1142, this Court addressed the same preemption question presented here, and held that Section 6(f) of the ESA expressly preempts California's attempts to ban commerce in American alligator products. *Fouke* arose in the wake of California's previous attempt to outlaw commerce in alligator products, which was codified in a prior version of §653o. This Court granted summary judgment to the plaintiffs, holding that California Penal Code Sections 653o and 653r were expressly preempted by the Endangered Species Act of 1973, particularly Section 6(f), 16 U.S.C. §1535(f). More specifically, this Court ordered and adjudged:

> Pursuant to the Supremacy Clause of the United States Constitution (Article VI, Clause 2), California Penal Code Section 653o and 653r are declared unconstitutional and unenforceable as applied to American alligator (alligator mississippiensis) hides unless the same are taken, bought, tanned, or fabricated in contravention of the U.S. Endangered Species Act of 1973 (16 U.S.C. §1531-1543) or regulations promulgated by the Secretary of Interior of the United States implementing said Act, or in contravention of the terms and conditions of a permit or exemption issued pursuant to said act or regulations.

Defendants, their agents, employees, and representatives are hereby permanently enjoined from enforcing California Penal Code Sections 653o and 653r as applied to American alligator (alligator mississippiensis) hides unless the same are taken, bought, tanned, or fabricated in contravention of the U.S. Endangered Species Act of 1973 (16 U.S.C. §1531-1543) or regulations promulgated by the Secretary of Interior implementing said Act, or in contravention of the terms and conditions of a permit or exemption issued pursuant to said act or regulations.

*Fouke*, 463 F. Supp. at 1145.

The *Fouke* Injunction—which expressly binds the California Attorney General—was not appealed and has not been modified or vacated. Plaintiffs are thus not just likely but *certain* to succeed on the merits, given that Defendant (as the successor official to the defendant in *Fouke*) remains subject to an ongoing permanent injunction barring any attempt to enforce a state ban on commerce in American alligator hides. To resolve the express preemption issue, this Court need only hold that the *Fouke* injunction remains in force and continues to bind Defendant.

Even apart from the ongoing injunction, however, the decision in *Fouke* is manifestly correct. The Challenged Laws would prohibit commerce in alligator products that is expressly authorized and permitted by federal law, including the Endangered Species Act and the CITES Treaty. The ESA's express preemption provision preempts state laws "with respect to the importation or exportation of, or interstate or foreign commerce in" endangered species to the extent that they "prohibit what is authorized pursuant to an exemption or permit provided for" in the Endangered Species Act. 16 U.S.C. §1535(f). Section 653o clearly applies to importation, exportation, and both interstate and foreign commerce. The only question is whether it prohibits that which is authorized by an exemption or permit.

Plaintiffs' commerce in alligator products is expressly authorized by federal law. To be permitted to trade in alligators, parties must obtain CITES tags, *see* 50 C.F.R. §17.42(a)(2)(ii) (setting out the conditions by which alligators may be taken and sold); 50 C.F.R. §17.42(a)(3) (setting out conditions by which American alligators may be imported or exported). The Landowner Plaintiffs must annually obtain such tags from the Louisiana Department of Wildlife and Fisheries. *See* Baker Decl. ¶14. And before shipment can occur, every harvested alligator hide must be inspected by an LDWF agent who verifies that the hide is tagged—otherwise it cannot enter

commerce. *Id.* When shipped abroad, the tags are again inspected by U.S. Port Inspectors at the point of export and then by CITES officials at the port of entry in the country that they are shipped to. *Id.* And Louisiana is required yearly to analyze and certify to the U.S. Fish and Wildlife Service that its harvest and export of American alligators are not detrimental to the survival of the species and that all alligators that enter trade are legally acquired. *Id*. ¶39 This permitting process expressly exempts Plaintiffs from federal bans on trading alligator products. *See* 16 U.S.C. §1538 (generally prohibiting takes, importation, exportation, and sale of endangered wildlife "[e]xcept as provided" in the ESA's permitting regime and exemptions).

California's attempts to override federal law regarding authorized commerce in endangered or threatened species have repeatedly been held unlawful and unenforceable. In addition to this Court's decision in *Fouke*, the Ninth Circuit has held multiple times that Section 653o is expressly preempted insofar as it seeks to ban commerce in products derived from endangered or threatened species where such commerce is authorized by federal law. In *Man Hing Ivory & Imports Inc. v. Deukmejian*, 702 F.2d 760, 761 (9th Cir. 1983), for example, a trader brought suit against California, challenging the prohibition on commerce in elephant products found in California Penal Code §653o. The district court held that the prohibition was preempted, and the Ninth Circuit affirmed. It held that "section 6(f) of the Endangered Species Act ... preempts California's statutory prohibition on trade in African elephant products by a trader who has secured all necessary federal permits" pursuant to the ESA and its regulations. *Id.* at 765. The Ninth Circuit confronted that question again in *H.J. Justin v. Deukmejian*, 702 F.2d 758 (9th Cir. 1983), and reaffirmed its holding in *Man Hing.* As the Court explained, "trade within California in elephant products" cannot be prohibited because "Section 653o could not be applied to the holder of a federal permit for import and export trade in African elephant products." *H.J. Justin*, 702 F.2d at 759.

In sum, California's latest attempt to ban the sale of alligator products contravenes the explicit directives of both federal law and Ninth Circuit precedent, as well as this Court's still-valid *Fouke* Injunction. Because §653o is expressly preempted by federal law as applied to American alligator products, it must be declared unconstitutional and enjoined as unenforceable under the Supremacy Clause.

**B.  The Challenged Laws are preempted because they pose an obstacle to the achievement of the purposes and objectives of federal law.**

Even absent an express preemption provision, state laws are preempted where they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). As this Court has recognized, the Supremacy Clause "invalidates state laws that interfere with … federal law." *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 851 (9th Cir.), *opinion amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002) (quotation marks omitted). Moreover, "to the extent [a state law] prevents federal agencies from protecting ESA-listed species, it is preempted by the ESA." *Id.* at 852. The Challenged Laws conflict with, and would severely undermine, the purposes and objectives of federal law, including the ESA and the CITES Treaty. They would also impede federal agencies from being able to protect the American alligator, an ESA-listed species. The Challenged Laws are thus not only expressly preempted, but impliedly preempted as well.

Congress has explicitly enumerated the purpose of the ESA:

> to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of [conservationist] treaties and conventions.

16 U.S.C. §1531. The ESA further instructs that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." *Id.* §1531(c)(1); *see also id.* §1531(c)(3) (conservation under the ESA means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary").

The American alligator is a tremendous success story for the ESA and CITES Treaty. That species was threatened with extinction in the 1960s, but the population has recovered substantially due to a close cooperative relationship between the federal government, state governments, and private parties such as landowners, farmers, and tanneries. *See* Baker Decl. ¶¶11-18. Revenue from

the sale of alligator hides and products is indispensable to this sustainable management program, as it supports conservation efforts and gives participants in the supply chain a powerful economic incentive to properly manage their wetlands and ensure a robust and healthy population of alligators. *See* Baker Decl. ¶¶19-23. The USFWS has expressly emphasized that "the best long-run hope" for the conservation of American alligators entails a comprehensive management program, including "economic incentives for the nations and peoples involved" to carefully control and manage the supply of such products. 42 Fed. Reg. at 2075.

If the Challenged Laws go into force, they will significantly disrupt revenue streams derived from sales of American alligator products. *See* Benge Decl. ¶¶12-21 ("I believe a collapse of the market for alligator eggs is almost certain if California's alligator ban goes into effect."); Baker Decl. ¶¶28-37 ("Participants in the alligator industry view the market as being at risk of total destruction as a result of section 653o."); *id.* at ¶31 ("I am informed by tanners and manufacturers that if California ports are closed to importation of alligator products, it will become too confusing to keep their clients informed of which U.S. ports can or cannot receive alligator products," thereby resulting in "the discontinuation of their alligator product trade with the United States").

If the market for alligator products collapses, there will be significantly decreased funds available for conservation and restoration efforts for both alligators and their habitats, thereby directly undermining the core purposes of the ESA. As declarant Osborne Baker of the Louisiana Department of Wildlife & Fisheries explained, "a well-functioning national market for alligator products is indispensable to Louisiana's [and the federal government's] broader conservation and environmental programs, since revenue from those sales gives landowners and farmers a powerful economic incentive to protect their alligators populations and habitats." Baker Decl. ¶36; *see also id.* at ¶33 ("Destruction, disruption, or even a significant decrease in the demand for alligator products will reduce the price for alligator hides and eggs, which will in turn impair Louisiana's ability to manage alligator populations at a biologically and publicly acceptable level."); Sparks Decl. ¶¶8-9 ("[Lousiana Landowners Association] members will reduce or cease investing in [alligator habitat protection] projects if the market for alligator hides and eggs significantly decreases."); Benge Decl. ¶16 ("It is well-known that Louisiana is battling the erosion of its coastal

lands, including lands owned by Delacroix. The economic value of American alligators and their eggs incentivizes Delacroix and other landowners to invest in erosion control and marsh maintenance projects. Indeed, revenue from harvesting American alligators and their eggs directly funds those projects. Without that revenue, investment by Delacroix and other landowners would become economically unsustainable.").

Those harms, moreover, would extend to endangered or threatened species beyond just American alligators. Alligator habitat is shared with many other endangered and threatened species—such as the whooping crane, ringed map turtle, and West Indian manatee—and protection and restoration of alligator habitat has collateral benefits for those species as well. Baker Decl. ¶¶24-27. Disruption of the American alligator conservation and management programs would thus undermine federal policy and objectives across an array of endangered and threatened species.

The Supreme Court's decision in *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000), is instructive. In *Geier*, an injured motorist brought a common-law tort action against Honda for failure to install airbags in its cars. Honda had designed its cars in compliance with a federal standard, which gave car manufacturers a choice as to whether to install airbags. *Id.* at 865. The Court found the plaintiff's claims to be preempted because allowing such claims would "upset the careful regulatory scheme established by federal law." *Id.* at 870. The plaintiff had argued that federal law merely established a regulatory floor that could be supplemented by additional state requirements. But the Court rejected that argument, holding that the federal standard "deliberately provided the manufacturer with a range of choices among different passive restraint devices.… [which] would bring about a mix of different devices introduced gradually over time … thereby lower[ing] costs, overcom[ing] technical safety problems, encourag[ing] technological development, and win[ning] widespread consumer acceptance—all of which would promote [the federal law's] safety objectives." *Id.* at 875.

*Geier* stands for the proposition that state law is preempted to the extent that it would disrupt a carefully balanced scheme of federal regulation. That principle applies with full force here. By ratifying the CITES Treaty, enacting the Endangered Species Act, and promulgating regulations governing the American alligator, the federal government has engaged in a careful and

comprehensive balancing of the various interests and incentives involved in preserving the species. It has generally forbidden takes, trade, and importation/exportation, *see* 16 U.S.C. §1538, but has then authorized each of those actions under certain, carefully defined conditions, *see* 50 C.F.R. §17.42(a)(2)-(3); 50 C.F.R. §23.70. This regulatory scheme—in which commerce in certain species is allowed but carefully restricted and regulated—allows for federal oversight of alligator commerce, discourages the emergence of a black market, encourages private investment in alligators and their habitats, and promotes sustainable models of alligator harvesting.

California's law, although claiming to be alligator-friendly, in fact threatens to disrupt the delicate balance struck by the federal government and impede the execution of federal policies supporting the sustainable management of threatened species. The Challenged Laws directly undermine the purposes and objects of federal law and are accordingly preempted.

### C.  The Challenged Laws violate the Commerce Clause by closing California's channels of commerce to lawful interstate and foreign commerce.

The Commerce Clause grants Congress the "Power . . . To regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, §8, cl. 3. The Supreme Court has also recognized that this clause has a "dormant" effect that precludes states from enacting laws that burden or discriminate against interstate commerce. *See Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008).

A core component of the Commerce Clause is the rule that states may not attempt to close the channels of commerce to lawful foreign or interstate commerce. *See, e.g.*, *Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 665 (1981) (restrictions in Iowa on truck length impermissibly burdened interstate commerce because they "substantially burden[ed] the interstate flow of goods by truck"); *Crandall v. State of Nevada*, 73 U.S. 35, 46 (1867) ("But if the State can tax a railroad passenger one dollar, it can tax him one thousand dollars. If one State can do this, so can every other State. And thus one or more States covering the only practicable routes of travel from the east to the west, or from the north to the south, may totally prevent or seriously burden all transportation of passengers from one part of the country to the other."); *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 723 (1972) (noting that the "right to free

access to [the nation's] sea-ports … is in its nature independent of the will of any State over whose soil he must pass in the exercise of it.").

The Challenged Laws have both the purpose and effect of closing California's channels of commerce—*i.e.*, its ports, highways, warehouses, and airports—to lawful interstate and foreign commerce in products derived from American alligators. For example, the Challenged Laws would forbid transporting an American alligator hide from Louisiana to Japan via the Port of Los Angeles or San Francisco International Airport, even if the product is not sold in California. Similarly, the Challenged Laws would prohibit shipping finished products from foreign countries to other U.S. markets via California's ports, airports, warehouses, or roads. Those restrictions are especially pernicious because export-import licenses issued by USFWS typically provide that the authorized wildlife products may be imported or exported through any designated port listed in 50 C.F.R. §14.12. At least two of the designated ports are located in California (San Francisco and Los Angeles). *Id.* California thus seeks to shut its channels of commerce to products that are expressly authorized to flow through those channels, in violation of both the Commerce Clause and the Supremacy Clause.

### D. California Penal Code §653o(b)(1) violates the Dormant Commerce Clause because it engages in extraterritorial regulation.

A state statute also violates the Commerce Clause if the "practical effect of the [law] is to control conduct beyond the boundaries of the state." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989), *see also id.* (the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State"). That is precisely the case here. The Challenged Laws are not based on a threat to the public health or safety of Californians who buy alligator products. Nor are those laws intended to regulate wildlife or wildlife habitat within California, since alligators do not exist naturally there.

Although the Challenged Laws are framed as a prohibition on in-state sales of certain products, the ultimate objective of those laws is to reduce the harvesting of American alligators *outside* of California. The California Legislature believed that "elimination of a market for products

derived from [the listed] species will promote their continued existence," and that the ban on the sale of products derived from those species will "at least decrease[] the market therefor." *People v. K. Sakai Co.*, 56 Cal. App. 3d 531, 537 (1976). In other words, both the purpose and effect of the Challenged Laws is to control conduct—the harvesting of alligators—that does not occur in California. *See* Baker Decl. ¶11. The Challenged Laws thus constitute an impermissible extraterritorial regulation in violation of the Commerce Clause.

## II.   The Remaining Preliminary Injunction Factors Tip Strongly in Favor of Plaintiffs.

Under either the likelihood-of-success standard or the sliding-scale approach, a TRO or preliminary injunction is warranted because Plaintiffs will incur irreparable harm absent such relief, and the balance of equities tips overwhelmingly in Plaintiffs' favor. Absent injunctive relief, Plaintiffs will suffer severe harm to their alligator conservation and management programs, as well as their businesses. California, by contrast, seeks to regulate a species that does not live in California through laws that have already been enjoined and whose effective date has been postponed for nearly 15 years. Any countervailing interests are *de minimis* and cannot outweigh the harm to Plaintiffs if the challenged laws go into force.

### A.   Plaintiffs will suffer irreparable harm in the absence of preliminary relief.

It is well established that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987). "If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.*; *see also Alliance for the Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding irreparable harm based on likely environmental harm to national forest); *Western Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1019-21 (D. Or. 2019) (finding likely harm to habitat of endangered sage grouse to constitute irreparable harm for purposes of TRO).

If allowed to go into force, the Challenged Laws would severely disrupt the market for alligator products and, in turn, directly undermine alligator conservation and management programs

1  as well as environmental protection and wetland restoration initiatives. Simply put, California's

2  law would have a devastating impact on efforts to protect American alligators and their habitat.

3       California is the country's most populous state and is a disproportionately large market for

4  luxury goods. *See* Baker Decl. ¶30; Benge Decl. ¶¶13-14. The Challenged Laws would not only

5  shut down sales of alligator products within California but would also ban the importation of such

6  products into the state and the possession with intent to sell. Without the California market—and

7  the ability to ship products through the channels of commerce in California—many manufacturers

8  will stop using alligator products altogether. Baker Decl. ¶30-32; *see also id.* (explaining that one

9  domestic tannery has had a $600,000 order for 600 alligator hides cancelled as a result of the

10  impending California ban).

11       Even for participants who remain in the market, prices for hides and eggs are likely to

12  plummet. Benge Decl. ¶¶13-15; *see also* Sparks Decl. ¶15 ("The alligator industry is faced with

13  substantial uncertainty and falling demand for hides (and corresponding falling demand for eggs)"

14  due to the Challenged Laws). One of the farmers that purchases eggs from Delacroix has already

15  lost contracts for sales of alligator hides due to the impending California laws; that farmer estimated

16  that he would purchase 50% fewer eggs next year if the ban goes into force. Benge Decl. ¶13. The

17  President of Delacroix predicts that "a collapse of the market for alligator eggs is almost certain if

18  California's alligator ban goes into effect." *Id.* at ¶14. These severe business harms are sufficient

19  to establish irreparable injury, as Plaintiffs will have no damages remedy for the loss of profits and

20  goodwill even if they ultimately prevail in this case, particularly given that California is shielded

21  by sovereign immunity. Where a party will be "unable to recover damages … even if they are

22  successful on the merits of their case, they will suffer irreparable harm if the requested injunction

23  is not granted." *California Hosp. Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated

24  and remanded on other grounds*, *Douglas v. Independent Living Center*, 565 U.S. 606 (2012).

25       But the irreparable harm to Plaintiffs goes far beyond just business or monetary losses. The

26  depressed demand for alligator eggs and hides if the Challenged Laws are allowed to take effect

27  will, in turn, undermine both state and private efforts to protect American alligators and their

28  habitat. "A critical part of Louisiana's success in recovering the American alligator was creating

1   an economic demand for alligator products." Baker Decl. ¶19. Revenue from the sales of alligator

2   eggs, meat, and hides "acts as a powerful incentive for private landowners to actively manage and

3   protect marshland to ensure a robust and health population of alligators." *Id.* ¶¶19-21. For example,

4   Delacroix and LLA's members have made significant investments to protect alligator habitat to

5   maximize alligator population and egg output. *See* Benge Decl. ¶¶6-11; Sparks Decl. ¶9. Delacroix

6   alone has invested approximately $4 million since 1997 in shoreline stabilization and marsh

7   restoration programs. Benge Decl. ¶10.

8          Those private investments are critical to Louisiana's and the federal government's broader

9   environmental goals. Because most coastal habitat in Louisiana is privately owned, the government

10  has no direct control over its management. Baker Decl. ¶21. The government thus depends on the

11  economic incentives provided by the alligator industry as a driver for private land management and

12  wetland restoration. *Id.* And those private investments in marshland protection have environmental

13  and conservation benefits beyond just alligators. Alligator habitat is shared with many other

14  endangered and threatened species—such as the whooping crane, ringed map turtle, and West

15  Indian manatee—and protection and restoration of alligator habitat will have collateral benefits for

16  those species as well. Baker Decl. ¶¶24-27; *see also Nat. Audubon Soc'y v. Davis*, 307 F.3d 835,

17  848-49 (9th Cir. 2002) (finding Article III injury to plaintiffs where California law would have

18  prohibited trapping predators of endangered or threatened species). The wetlands protection and

19  restoration programs funded by revenue from sales of American alligator products also serves as a

20  critical buffer against storm surge and rising sea levels. *See* Benge Decl. ¶18. In short, "[a] robust

21  and well-functioning market for alligator products … is essential to advancing Louisiana's

22  conservation and environmental goals, in addition to generating significant economic activity in its

23  own right." *Id.*

24         Allowing the Challenged Laws to go into force would severely disrupt the revenue streams

25  that are used for investments in conservation and management of alligator habitat. For example, a

26  decrease in the price of alligator eggs would jeopardize Delacroix's ability to fund an additional $3

27  million of investments in shoreline stabilization, marsh restoration, and erosion control. *See* Benge

28  Decl. ¶¶15-17, 19-20; *see also* Sparks Decl. ¶¶9, 15 (noting likely delayed or cancelled investments

if the Challenged Laws take effect). Simply put, "California may believe that its law will help protect American alligators, but it will actually have the opposite effect by severely disrupting the revenue streams that fund conservation efforts for American alligators and wetland habitats." Baker Decl. ¶36.

### B.  The balance of equities strongly favors Plaintiffs

The balance of equities here tips overwhelmingly in favor of the Plaintiffs. On one side of the ledger, Plaintiffs—as explained above—will incur severe and irreparable harm to their conservation, environmental, and business interests if the Challenged Laws are allowed to go into force. On the other side of the ledger, any harm to California's interests resulting from a TRO or preliminary injunction will be *de minimis*.

*First*, California does not—and cannot—suggest that the Challenged Laws are needed to protect the health or safety of its citizens or advance any other core state interest such as protecting California's own environment or native species. *See*, *e.g.*, *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 546 (7th Cir. 2007) (granting injunction pending appeal of state ban on slaughtering horses for human consumption because "[t]he horsemeat statute is remote from the vital interests of most Illinois residents" given that the meat in question was being exported). Instead, the express purpose of the Challenged Laws is to disrupt the market for products derived from American alligators and, in turn, reduce the number of alligators that are harvested each year. *See supra* at 6, 17-18. But the American alligator's habitat does not include California. *See* Baker Decl. ¶11. Thus, California is effectively seeking to regulate conduct that occurs entirely in other states, and to override those states' sovereign judgment about how to manage their natural resources and threatened species. As between California's remote interests in protecting a non-native species and the direct interest of the states in which American alligators actually live, the balance of equities is not close.

*Second*, the history of the Challenged Laws undermines any suggestion that California will be harmed by a TRO or preliminary injunction pending resolution of this case on the merits. As noted above, this Court enjoined the predecessor statute to the Challenged Laws in the *Fouke* case. California then *repealed* that statute in 2006 but included a sunset provision in which the

1   prohibition on sales of alligator products would spring back into force. Since 2006, the effective

2   date for the sunset has been extended multiple times, for a total of 14 years. Given that California

3   itself has postponed implementation of the Challenged Laws for nearly two decades, it would strain

4   credulity for Defendant to assert that any of California's interests outweigh those of the Plaintiffs,

5   or that California would incur any meaningful harm if those laws were enjoined pending resolution

6   of this suit.

7        *Third*, as explained above, American alligators are exhaustively regulated at both the federal

8   and state levels. *See* Baker Decl. ¶¶12-14. Thus, even if the Challenged Laws were deemed to have

9   some (misguided) conservation purpose, they would still be redundant at best. The Ninth Circuit

10   has found that a state's asserted interests were outweighed by countervailing interests when other

11   existing laws already addressed the problem the state laws were designed to solve. *See*, *e.g.*, *Am.*

12   *Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) ("Still and

13   all, with or without the Concession agreements, many other programs and laws designed to alleviate

14   those problems are in existence and are not challenged.").

15       **C.  A TRO or preliminary injunction would be in the public interest**

16        When the government is a party to the case, the public interest factor and balance of the

17   equities factor typically "merge." *League of Wilderness Defenders v. Connaughton*, 752 F.3d 755,

18   766 (9th Cir. 2014). The public interest thus favors Plaintiffs for the same reasons that the balance

19   of equities favors Plaintiffs. Moreover, it would not be "equitable or in the public's interest to

20   allow the state … to violate the requirements of federal law, especially when there are no

21   adequate remedies available." *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013);

22   *see also Western Watersheds Project*, 391 F. Supp. 3d at 1026 ("When the alleged action by the

23   government violates federal law, the public interest factor weighs in favor of the plaintiff.").

24       **<u>CONCLUSION</u>**

25        For the foregoing reasons, the Court should grant Plaintiffs' Motion for a Temporary

26   Restraining Order and Preliminary Injunction and temporarily enjoin, for the pendency of this

27   action, Defendants from enforcing California Penal Code §653o(b)(1).

28

Memorandum in Support of
Motion for Preliminary Injunction

1          Respectfully submitted,

2     Dated: December 12, 2019          */s/ Bryan K. Weir*
                                        ELIZABETH B. MURRILL*
3                                          *Solicitor General*
                                        JOSEPH S. ST. JOHN*
4                                          *Deputy Solicitor General*
                                        SHAE G. MCPHEE*
5                                          *Assistant Solicitor General*
                                        LOUISIANA DEPARTMENT OF JUSTICE
6                                       1885 N. Third Street
                                        Baton Rouge, LA 70804
7                                       Tel: (225) 326-6766
                                        emurrill@ag.louisiana.gov
8                                       stjohnj@ag.louisiana.gov

9                                       JEFFREY M. HARRIS*
                                        BRYAN K. WEIR (CA Bar #310964)
10                                      JORDAN M. CALL*
                                        CONSOVOY MCCARTHY PLLC
11                                      1600 Wilson Boulevard, Suite 700
                                        Arlington, VA 22009
12                                      Tel: (703) 243-9423
                                        jeff@consovoymccarthy.com
13                                      bryan@consovoymccarthy.com
                                        jordan@consovoymccarthy.com
14
                                        *Counsel for Louisiana Wildlife and Fisheries Commission*
15

16                                      MELINDA BENGE BROWN*
                                        DELACROIX CORP.
17                                      206 Decatur Street
                                        New Orleans, LA 70130
18                                      Tel: (504) 595-6191
                                        mbbrown@delacroixcorp.com
19
                                        *Counsel for Delacroix Corp.*
20

21                                      M. TAYLOR DARDEN*
                                        CARVER DARDEN KORETZKY TESSIER FINN
22                                          BLOSSMAN & AREAUX LLC
                                        1100 Poydras Street, Suite 3100
23                                      New Orleans, LA 70163
                                        Tel: (504) 585-3804
24                                      darden@carverdarden.com

25                                      *Counsel for Louisiana Landowners Ass'n, Inc.*

26
                                        *Application for admission
27                                      pro hac vice forthcoming*

28

      Memorandum in Support of                23
      Motion for Preliminary Injunction

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this pleading with the Clerk of the Court using the CM/ECF system. I certify that I have caused this pleading to be served on Defendant Xavier Becerra at the below address, pursuant to California Rules of Court 8.29(c), via rush delivery. Counsel for Plaintiff Louisiana Wildlife and Fisheries Commission has also been in communication with counsel for Defendant and will e-mail counsel for Defendant this filing as well.

Xavier Becerra
Office of the Attorney General
1300 "I" Street
Sacramento, CA 95814-2919

Dated: December 12, 2019

Respectfully submitted,

*/s/ Bryan K. Weir*
BRYAN K. WEIR (CA Bar #310964)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22009
Tel: (703) 243-9423
bryan@consovoymccarthy.com